**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **NO. 5:26-CR-00046-GFVT-MAS-1** |
| ) | |
| **ANDREW SELVA,** ) | |
| ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## REPORT AND RECOMMENDATION

This matter is before the undersigned on referral from United States District Judge Van Tatenhove for a Report and Recommendation on the United States' Motion to Revoke a release order issued by a Magistrate Judge in the Central District of California. [DE 11, 12]. The motion is filed under 18 U.S.C. § 3145(a), which permits *de novo* review of release order. The undersigned held a hearing on May 22, 2026. [DE 23]. After considering the testimony, Pretrial Services Report ("PSR"), proffer, Defendant's written Opposition to Pretrial Detention and Proposed Bond Conditions [DE 21], and arguments, the Court recommends that the motion be granted, and Defendant Andrew Selva be detained pending trial.

### I.    PROCEDURAL HISTORY

On April 16, 2026, a federal grand jury returned an indictment charging Defendant Andrew Selva ("Selva") with one count of conspiracy to distribute a

Schedule II controlled substance in violation of 21 U.S.C. § 841(a)(1) and § 846 (Count 1); two counts of distribution of a Schedule II controlled substance in violation of 21 U.S.C. § 841(a)(1) (Counts 2 and 3); and one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956 (Count 4). [DE 1].

Selva was arrested in the Central District of California and subsequently appeared before Magistrate Judge David T. Bristow on April 27, 2026, for an initial appearance. [DE 13, Page ID# 50]. There, the United States moved for detention, and Selva requested that the detention hearing be held in the district of arrest. Following a detention hearing, Judge Bristow denied the government's motion and entered an order setting conditions of release. [DE 13, Page ID# 67].

The United States promptly moved this Court to stay and revoke the release order. [DE 1]. The Court granted a stay and directed that Selva be transferred to the Eastern District of Kentucky for further proceedings. [DE 12]. Judge Van Tatenhove also referred the Motion to Revoke to the undersigned for preparation of a Report and Recommendation. After Selva's arrival in this District, the undersigned conducted an initial appearance and a hearing on the government's Motion to Revoke under 18 U.S.C. § 3145(a). [DE 15, 23].

## II.   ANALYSIS

### A.   LEGAL STANDARD FOR PRETRIAL DETENTION

Under the Bail Reform Act, 18 U.S.C. § 3141, *et seq.*, ("BRA"), "if a person is ordered released by a magistrate . . . the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order[.]" 18 U.S.C. § 3145(a)(1). "At that point, the district court can undertake a *de*

*novo* review of the magistrate judge's decision." *United States v. Baker*, No. 6:21-CR-32-CHB, 2021 WL 2744512, at *3 (E.D. Ky. July 1, 2021). The court with original jurisdiction over the charged offense may also, in its discretion, conduct a hearing to take additional evidence. *Id.* at *3 (citing *United States v. Cidraz-Santiago*, 18 F. Supp. 3d 124, 126 (D.P.R. 2014)); *United States v. Hanson*, No. 3:22-CR-00076, 2022 WL 1813585, at *4 (N.D. Ohio May 3, 2022) ("[A] district court may rely on both the evidence and offers of proof presented at the original detention hearing before the magistrate judge, as well as additional evidence and offers of proof at its discretion." (quoting *United States v. McCollum*, No. 3:21-CR-35, 2021 WL 4468937, at *1 (E.D. Tenn. Sept. 29, 2021))).

Under the BRA, *de novo* review entails reviewing the legal bases of the detention decision. Here, the Court conducted a hearing to afford the parties the opportunity to present all evidence and make all arguments to inform its *de novo* review. Given the charges, a detention presumption arises under the BRA as to both nonappearance and danger risk. 18 U.S.C. § 3142(e)(3)(A). Accordingly, the defendant carries a "burden of production" to overcome the presumption by offering "at least some evidence" that he is neither at risk of nonappearance nor endangering the community. *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010). The production burden "is not heavy," and the Government retains the ultimate burden of persuasion. *Id.* If the defendant fails to rebut the presumption, he must be detained. Even if the defendant rebuts the presumption, the presumption remains a factor in determining detention. *Id.* ("The presumption remains as a factor because

it . . . reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial.").

The facts proffered by defense counsel both in this District, combined with the facts detailed in the PSR, as discussed below, provided sufficient evidence to overcome the presumption as to both danger and risk of nonappearance. Thus, the burden shifted back to the United States to prove that detention was warranted based on either Selva's risks of nonappearance or danger to the community. Detention, based on danger, must rest on facts supported by clear and convincing evidence. 18 U.S.C. § 3142(f). A nonappearance-based detention decision must rest on facts supported by a preponderance of evidence. *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *United States v. Curry*, No. 6:06-82-DCR, 2006 U.S. Dist. LEXIS 49661, 2006 WL 2037406, at *6 (E.D. Ky. Jul. 18, 2006). Further, almost any conditional release ultimately depends on a court's assessment of a defendant's good faith intentions and predicted compliance with conditions imposed. *See United States v. Tortora*, 922 F.2d 880, 887 (1st Cir. 1990) (evaluating predicted good faith compliance as critical release component).

Evidence rules do not apply in the detention hearing context. 18 U.S.C. § 3142(f). The hearing is informal, and the Court may consider a wide range of proof, weighing the evidentiary reliability and accuracy. *See, e.g.*, *United States v. Webb*, 149 F.3d 1185 (Table), No. 98-1291 [published in full-text format at 1998 U.S. App. LEXIS 13553], 1998 WL 381686, at *1 (6th Cir. June 22,

1998).  The nature and quality of proof impacts its probative value and weight in the detention calculus.  The § 3142(g) factors guide the analysis.

**B.   RISK OF DANGER TO THE COMMUNITY**

The § 3142(g) factors drive the analysis.  Specifically, the Court must consider the history and characteristics of the defendant, the nature and circumstances of the offense charged the weight of the evidence against the person, and the nature and seriousness of the danger to any person or the community that would be posed by the person's release.  *See* 18 U.S.C. § 3142(g).

**1.   Selva's History and Characteristics**

The Court must consider many aspects of Selva's background in making the decision to release or detain him.  Specifically, the BRA requires courts to "take into account the available information concerning— [ . . . ] the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation[.]"  18 U.S.C. § 3142(g)(3).

Selva was born in Huntington Park, California, and has lifelong ties to Riverside County.  There, he reports having numerous family members, including his mother, father, four brothers, three sisters, and a girlfriend of eight years, Lizeth Pardao.  [PSR at 2].  Selva maintains regular contact with his parents, with both appearing at the California and Kentucky detention hearings.  He also reports that

he has resided with Pardao in Moreno Valley, California since February 2026. If released, Selva will return to live with Pardao in Moreno Valley.

Selva is 27 years old. He reports that he did not complete high school or obtain his GED. [PSR at 2]. Selva reports being unemployed for the six months before his arrest; however, he notes that he was scheduled to start working on a demolition project the week of his arrest. [PSR at 3]. He does not report any significant physical health issues and the PSR reflects intermittent use of marijuana and cocaine. [PSR at 4]. Additionally, Selva reports that he is in generally good mental health but notes that he was previously on an anti-depressant. Further, his mother expressed concern for Selva's mental health, reporting that he attempted suicide at nine-years-old. Selva reports that he does not possess a passport, but has traveled to Mexico six times, with the most recent trip occurring in 2025 to visit family. Notably, his mother stated that she was only aware of three trips to Mexico, with the most recent occurring when Selva was only five years of age.

Selva's criminal history is relatively *de minimis*, with the only reported criminal history relating to the instant offense in this matter. Selva received charges in the State of California in November 2025 for possession of a controlled substance for sale, the transportation or sale of controlled substance, and the possession of a controlled substance while armed. [PSR at 4].

In sum, Selva's characteristics suggest strong ties to the Central District of California and substantial family support. Furthermore, he has no criminal history that does not relate to the conduct underpinning the instant Indictment. All in all,

the considerations under this factor do not suggest that Selva is a danger to the community and, thus, this factor favors release.

### 2.    The Nature and Circumstances of the Offense Charged

The next BRA factor is the "nature and circumstances of the offense charged, including whether the offense . . . involves a . . . controlled substance, [or] firearm[.]" 18 U.S.C. § 3142(g)(1).  At the detention hearing, the United States offered proffer of Selva's alleged criminal conduct, predominantly via testimony by Drug Enforcement Agency Task Force Officer Payton Parrigan ("TFO Parrigan").

According to the government, the investigation which resulted in the charges against Selva began with a target known as "RC 1," later determined to be Justin Ash ("Ash").  Law enforcement agents in the Eastern District of Kentucky determined that Ash operated a counterfeit pill trafficking operation from a box truck on Antelope Road in Marietta, California.  Using a confidential source ("CS"), officers purchased counterfeit Adderall and alprazolam, the generic form of Xanax, from Ash.

During surveillance of the trafficking operation, law enforcement identified Selva as an apparent participant in the operation.  TFO Parragin testified that Ash and Selva appeared to operate in a form of partnership: they shared ingredients, a pill press, proceeds, and consulted one another regarding transactions, while still maintaining aspects of separate operations.

TFO Parragin further testified that Selva frequently visited the trafficking location.  On one occasion, agents observed Selva arrive at the box truck while Ash and other individuals were present, then leave carrying a large plastic bag.  On another occasion, Selva arrived carrying a backpack that appeared empty, entered

the truck, and later exited with the backpack appearing substantially fuller.  In mid-October 2025, Selva again arrived at the site carrying a brown bag, entered the box truck for an extended period, exited and waited outside, then re-entered the truck before ultimately leaving with a large plastic bag.  TFO Parragin noted that this activity coincided with a controlled purchase by officers in the Eastern District of Kentucky of approximately 5,000 counterfeit Adderall pills from Ash through the CS.

On November 4, 2025, law enforcement executed multiple search warrants relating to the investigation.  At the pill pressing location, officers recovered a large pill press, buckets of pills, binding agent, a mixer, and raw ingredients, including approximately 1700 grams of methamphetamine. Officers also seized and searched multiple digital devices belonging to Ash.

According to TFO Parragin, the search of those devices uncovered communications between Ash and Selva through encrypted applications, including Telegram and Session.  The communications allegedly reflected discussions regarding the pill pressing operation, including the number of pills Selva needed, financial matters, and meetings at the box truck location.  Agents also discovered conversations from mid-October 2025 indicating that Selva appeared to be sourcing methamphetamine necessary to manufacture the counterfeit pills.

TFO Parragin testified that, because Ash was traveling outside the country during that time, Ash instructed Selva regarding the pill-manufacturing process and provided him with the recipe for the counterfeit pills.  Thereafter, Selva allegedly sent Ash a photograph of orange counterfeit Adderall pills, which Ash then forwarded to

the CS.  Selva also provided Ash with a tracking number that Ash transmitted to the CS.  According to TFO Parragin, both the appearance of the pills and the tracking information matched the package later recovered by law enforcement officers in the Eastern District of Kentucky.

Additionally, the communications allegedly suggested that Selva operated the "EliteBars" account on DrugHub, a Darknet marketplace frequently used for controlled substance trafficking.  In one exchange, Selva referenced selling cocaine.  Parragin also testified that Ash sent Selva a screenshot describing the potential ten-year mandatory minimum sentence associated with trafficking a quantity of methamphetamine of that size.  In response, Selva allegedly stated "F*** it" and referenced the possibility of a shootout if law enforcement executed a raid.

TFO Parragin furhter testified that the search of Selva's residence revealed substantial evidence consistent with drug trafficking.  Officers recovered large quantities of counterfeit pills, three handguns, ammunition, and other controlled substances, including more than five kilograms of cocaine, MDMA, and over 720 grams of fentanyl.  Officers also seized approximately $13,000 in cash, a money-counting machine, and approximately twelve cellular devices.

In addition, law enforcement recovered post office boxes, tape, and other packaging materials consistent with the mailing of controlled substances.  Officers had also previously observed Selva traveling with a possible co-conspirator to two separate post offices on multiple occasions. TFO Parragin testified that this activity was significant because individuals who distribute controlled substances through

Darknet marketplaces commonly utilize the United States Postal Service to ship narcotics.

In drafting the BRA, Congress determined that "drug offenders pose a special risk of flight and dangerousness to society." *United States v. Hare*, 873 F.2d 796, 798–99 (5th Cir. 1989). Specifically, "the risk of continued narcotics trafficking on bail constitutes a risk to the community." *Id.* The facts underpinning Selva's charges are gravely concerning, as they evidence a prominent role in a drug trafficking scheme of a scale that would pose an extreme risk of danger to the community. TFO Parragin testified that Selva was frequently observed at the pill-pressing location, where he spent extended periods inside the box truck, arrived carrying various items, and departed with large bags appearing to contain materials from the operation. Moreover, law enforcement recovered substantial quantities of dangerous controlled substances, including fentanyl, as well as drug trafficking paraphernalia, large amounts of cash, and encrypted communications indicative of a sophisticated and extensive operation in which Selva allegedly played a prominent role. Moreover,

Congress placed a presumption of detention for offenses such as the ones alleged here, and that presumption does not evaporate simply because a defendant overcame the presumption. *United States v. Lattner*, 23 F. App'x. 363, 364, (6th Cir. 2001) (citing *United States v. Martir*, F.2d 1141, 1144 (2d. Cir. 1986)). Congress's intent is also reflected in the seriousness of the consequences associated with the charges in the Indictment. On Counts 1, 2, and 3 alone, Selva faces a mandatory

minimum of 10 years, which reflects the severity of the consequences he faces if found guilty.

### 3.    The Weight of the Evidence of Dangerousness

In weighing the strength of the evidence, the district court may not modify or limit the defendant's presumption of innocence. 18 U.S.C. § 3142(g). "[T]he § 3142(g) analysis is concerned with a practical assessment of the defendant's dangerousness, rather than an adjudication of guilt for a particular offense." *United States v. Tolbert*, 2017 WL 6003075, at *5 (E.D. Tenn. Dec. 4, 2017) (citing *Stone*, 608 F.3d at 948).

This factor is somewhat duplicative of § 3142(g)(1) and (3) because, in considering a defendant's overall dangerousness, the Court must consider the facts of the crime alleged as well as evidence that the defendant has been dangerous in the past, such as criminal history and a history of violent behavior. As noted above, Selva faces serious charges relating to interstate drug trafficking. Although the evidence connecting him to the large-scale distribution of highly dangerous narcotics is substantial, Selva's criminal history is virtually nonexistent.

The most concerning consideration under this factor is the presence of multiple firearms and ammunition in Selva's residence, potentially in furtherance of the alleged trafficking operation. Although Selva argues that his girlfriend was charged for possession of firearms, Selva also has a related state charge for the possession of a controlled substance while armed. [PSR at 4].

It is well-established that the combination of drugs and firearms poses a serious risk of danger to the community. *United States v. Flowers*, No. 3:05-CR-72, 2005 WL 1981364, at *4 (E.D. Tenn. Aug. 17, 2005) (observing that the "sale of drugs

[ ] establish[es] a significant danger" and "[t]he addition of guns to the equation" would only increase it); *United States v. Taylor*, 289 F. Supp. 3d 55, 64 (D.D.C. 2018) (observing that "the combination of the distribution of drugs and the illegal possession" of firearms presented a serious danger to the community).  Further, TFO Parragin testified that Selva discussed the possibility of a "shootout" with law enforcement officers if a raid was conducted.  Although this event did not occur at the time of his arrest, Selva's consideration and flippant discussion of such an act, when coupled with his ability to access firearms and ammunition, raises serious concerns for this Court as to his propensity for dangerousness.  Furthermore, aside from arguing that his girlfriend was charged with the possession of the firearms, Selva did very little to show that the firearms were not within his possession or control or explain the alleged statements regarding a shootout with law enforcement.

Although this factor presents a close call due to Selva's minimal criminal history, the strength of the government's evidence of present dangerousness and those concerns arising from Selva's comments regarding firearms and law enforcement mortality, along with his potential ability to access said firearms, support a finding that this factor favors a danger-based detention.

### 4. <u>The Nature and Seriousness of Danger Posed by Release</u>

For the fourth and final factor under the BRA, the Court must weigh "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."  18 U.S.C. § 3142(g)(4).  In cases involving drug trafficking, courts have repeatedly recognized the grave threat such conduct poses to the community.  *See, e.g., United States v. Flowers*, No. 3:05-CR-72, 2005 WL

1981364, at *4 (E.D. Tenn. Aug. 17, 2005) (noting that the "sale of drugs [ ] establish[es] a significant danger"); *United States v. Pina-Aboite*, 97 F. App'x 832, 836 (10th Cir. 2004) ("[T]he danger-to-the-community factor is not simply about physical violence; the risk that a defendant will continue to engage in drug trafficking constitutes a danger to the community[.]").

Although there are several factors that are mitigating in the danger assessment—strong family connections and support, no criminal history, and a verified background, there are many significant factors that indicate a serious risk of danger to the community—mental health concerns, the seriousness of the allegations, the evidence of substantial drug trafficking operations, the presence of firearms in Selva's residence, and Selva's comments indicating a propensity for violence toward law enforcement.   Judge Bristow set stringent release conditions, including a $190,000 appearance bond, travel restrictions, employment requirements, drug testing, mandatory mental health treatment, and home detention.  However, in light of the information provided in the PSR and the testimony at the hearing in the Eastern District of Kentucky, the Court finds that these release conditions are insufficient to mitigate the serious and particular danger that Selva's release would pose.

While Selva appears to have strong family support, that support did not deter the conduct alleged here.  Selva is now facing allegations of trafficking highly dangerous and addictive substances, in connection with large sums of cash, drug paraphernalia, and multiple firearms.  Moreover, Selva requests that he be allowed

to return to his residence in California to live with his girlfriend, who is also facing state charges related to the possession of firearms. Allowing Selva to live with another individual facing related firearm charges raises serious concerns about what may occur or continue to occur in the residence. Furthermore, it indicates that Selva's girlfriend is potentially tangentially involved in the operation and, thus, unlikely to report him if he violates the conditions of release.

Even the most restrictive conditions, including home incarceration, would not adequately address the danger Selva presents, particularly given that a drug operation can be run with nothing more than a cell phone. *United States v. Nova*, No. CR 16-060-02 S, 2016 WL 6471205, at *2 (D.R.I. Nov. 1, 2016) (finding that electronic monitoring and home detention conditions would not be effective to mitigate danger where the defendant could easily participate in the charged heroin distribution scheme from his home). This concern is amplified by Selva's apparent technological sophistication, including his alleged use of encrypted communication applications designed to evade law enforcement detection and his possession of approximately a dozen cellular devices. Although the United States Probation Office ("USPO") is highly experienced in supervising defendants on pretrial release and conducting residential searches, monitoring and preventing access to that number of devices presents a substantial challenge. As does ensuring that Selva has not obtained a new device of which USPO is not aware. Given the small size and portability of modern cellular phones, ensuring that Selva could not obtain or conceal additional devices would be exceedingly difficult.

Considering the analysis above, the Court finds that the government demonstrated by clear and convincing evidence that Selva's release would pose a risk of danger to the community. *United States v. Santiago-Pagan*, No. 1:08-CR-0424-01, 2009 WL 1106814, at *7 (M.D. Pa. Apr. 23, 2009) (concluding that the defendant's alleged involvement in the distribution of "a large quantity of narcotics cuts strongly against his motion for release pending trial" because "[t]he seriousness of the crimes alone . . . allows the court to draw the inference that defendant will simply continue his alleged narcotics activity if released") (collecting supportive cases). The Court does not take comfort that any release condition could sufficiently mitigate the risk of danger he poses to the community and therefore recommends that government's Motion to Revoke be granted, and Selva be detained.

C.    SELVA'S RISK OF NONAPPEARANCE

Collectively, the nature and circumstances of the instant offense, the weight of the risk of nonappearance evidence, and the history and characteristics of Selva drive the detention analysis.[1]  First, the nature and circumstances of the offense in this case indicate some foundational nonappearance risk. *See United States v. Downsbrough*, No. 3:13-CR-61, 2013 WL 2447858, at *1 (E.D. Tenn. June 5, 2013) (noting that Congress has attached a presumption to those types of crimes, such as drug trafficking, which indicate a "strong probability" that the perpetrator will flee (citing *Stone*, 608 F.3d at 947 n.6)). Selva's possible prison sentence, a mandatory ten years to life, is certainly long enough to encourage nonappearance or flight on

---

[1] The § 3142(g)(4) considerations do not bear on flight or nonappearance risk in this case. The Court considers that factor briefly in relation to its danger analysis, *supra*.

some level.  *See United States v. Tawfik*, No. 17-CR-20183-2, 2017 WL 1457494, at *6 (E.D. Mich. Apr. 25, 2017) (considering mandatory prison sentences of 15 years to life as a factor that "weighs heavily in favor of detention").  Thus, this factor weighs in favor of detention.

The remaining factors germane to the risk of nonappearance—Selva's history and characteristics and the weight of nonappearance evidence—logically merge in this scenario, as Selva's background and current circumstances supply the pertinent proof.  *Id.* §§ 3142(g)(2)–(3); *see also United States v. Sykes*, No. 04-cr-80623, 453 F. Supp. 3d 1011, 1015–16 (E.D. Mich. Apr. 13, 2020) (noting that, in this Circuit, the § 3142(g)(2) factor looks only to the weight of the evidence that the defendant is a flight risk or a danger (citing *United States v. Stone*, 608 F.3d 939, 948 (6th Cir. 2010))); *accord United States v. Sanders*, 466 F. Supp. 3d 779, 785 (E.D. Mich. 2020). Section 3142(g)(3) requires courts to consider "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings" and whether, at the time of the current offense the person was on probation or pretrial release.  18 U.S.C. § 3142(g)(3).  The evidence concerning Selva's overall risk of nonappearance, though mixed, shows that although he has several possible incentives to flee, he has more incentives to remain in California and appear as directed in the Eastern District of Kentucky.

In both the PSR and his filed opposition, Selva reported that he does not possess a passport and has only travelled abroad to Mexico on six occasions. He reports that his most recent trip occurred in 2025 to visit family. His mother, however, did not report having any knowledge of Selva's recent trips to Mexico. The United States argues that this frequent and undocumented travel to Mexico, to visit "family" that his mother is not familiar with is extremely concerning as it demonstrates Selva's ability to cross an international border without a passport. Additionally, the government posits that the fact that Selva will be released to Riverside County, California, exacerbates that concern, implying that Selva's proximity to the border, and ability to access it, would prevent United States Probation Office from effectively preventing him from fleeing, should he decide to do so.

While the Court recognizes that there are some legal ways to travel to Mexico without a passport, Selva's recent travel still presents at least some level of concern. And the fact that Selva has international ties and the apparent ability to cross the border undocumented to meet them is similarly concerning. *United States v. Fata*, No. CRIM. 13-30484, 2013 WL 4084765, at *6 (E.D. Mich. Aug. 13, 2013) (finding pretrial release unwarranted where defendant had significant family ties to Lebanon, despite defendant being a U.S. citizen for years). The government's concern that Selva may flee undetected, however, is offset by the fact that Riverside County is over 100 miles from the border between the United States and Mexico, and there are many different mechanisms available to USPO to surveil and prevent such flight.

Additionally, Selva is a United States citizen with a residence in and many ties to California, which will certainly encourage him to stay within the confines provided by Judge Bristow. *United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) ("[w]hen assessing an alien defendant's ties to the United States, factors to be considered include how long the defendant has resided in this country, whether defendant has been employed in the United States, whether defendant owns any property in this country, and whether defendant has any relatives who are United States residents or citizens.")

Conversely, the United States notes that Selva lacks any ties to the Eastern District of Kentucky and argues this absence of community connections in the prosecuting district increases the risk of nonappearance. Although the fact that a defendant does not have ties to the prosecuting district may weigh in favor of detention, a defendant's ties to another community in the United States may act to counterbalance the lack of ties to the prosecuting district. *United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990); *United States v. Abrego*, 787 F. Supp. 3d 930, 964 (M.D. Tenn. 2025).

Here, Selva has strong family ties, as evidenced by the multiple family members who attended both the detention hearing in California and the one in Kentucky. He also has strong ties to his community in California, where he has lived his entire life. Moreover, Selva's California state charges were brought in November 2025. He has had multiple opportunities to fail to appear or flee to Mexico. But he has not. Selva reports that he has appeared at two court-mandated appearances in

his state case pursuant to the conditions of his bond. Aside from the potential for a more substantial prison sentence, the United States has not presented any specific evidence to indicate that Selva may act differently now. As such, his ties to California are sufficient to counterbalance his lack of ties in this district.

The United States also points to the fact that Selva does not have stable employment as a factor favoring detention. Indeed, a defendant's long unemployment typically favors nonappearance-based detention. *United States v. Stidham*, No. 3:10-CR-79, 2010 WL 2639925, at *3 (E.D. Tenn. June 25, 2010). Selva reports being unemployed for the six months leading up to his arrest on federal charges; however, this concern is mitigated by Judge Bristow's requirement that Selva obtain approved employment upon release.

In sum, Selva's lack of criminal history, history of appearing as directed in the related state case, and strong ties to the district where he will be released, override the concerns that this Court has regarding his travel to Mexico, proximity to the border, and lack of ties to this district. Thus, these factors must favor release.

Additionally, Selva was released on a $190,000 bond secured by three sureties. Selva reports that the total surety amount now amounts to $300,000 from six sureties who are personally known to him. Thus, this Court believes that the amount of the bond and the identity of the sureties creates compelling pressure for Selva to appear as directed by the Court. The Court is confident that this, when coupled with the other conditions imposed by Judge Bristow, is sufficient to ensure Selva's appearance in future proceedings. Accordingly, the Court finds that the United States has failed

to show by a preponderance of the evidence that no conditions can reasonably assure Selva's appearance in this case. Therefore, detention on this basis is not appropriate under the BRA.

### III.   RECOMMENDATION

The Court finds that while Selva overcame the presumption as to risk of danger to the community and nonappearance, the government met its burden to show by clear and convincing evidence that Selva is an irremediable danger to the community and should be detained pending trial. Thus, the government's Motion to Revoke should be granted. Accordingly, for the reasons stated herein,

**IT IS RECOMMENDED** that the District Court **GRANT** the United States' Motion to Revoke [DE 11].

### *Right to Object*

The Court issues this Recommended Disposition under Federal Rule of Criminal Procedure 59(b) and 28 U.S.C. § 636(b)(1)(B). Within **fourteen days (14)** after being served with a copy of this decision, any party may serve and file specific written objections to any or all findings or recommendations for determination, *de novo*, by the District Court. The parties should consult the aforementioned statute and rule for specific appeal rights and mechanics. Failure to make timely objections consistent with the statute and rule may, and normally will, result in waiver of further appeal to or review by the District Court and Court of Appeals. *See United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981); *Thomas v. Arn*, 106 S. Ct. 466, 468 (1985).

Signed this the 29th of May, 2026.



MATTHEW A. STINNETT
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF KENTUCKY